MERCED MINING CO. (FREMONT v.). See Case No. 5,095.

MERCEIN (BARRY v.). See Case No. 1,062.

MERCER (BARTLETT v.). See Case No. 1,078.

---

## Cas No. 9,433.

### MERCER v. The FLORIDA.

[3 Hughes, 488.] [1]

District Court, E. D. Virginia. Jan., 1878.

COLLISION—VESSEL AT ANCHOR—CONCLUSIVE PRESUMPTION.

Where a vessel lying at anchor in a harbor on proper ground showing lights is run into by a moving steamer and damaged, the presumption of fault is conclusive against the steamer.

Libel in admiralty [by John L. Mercer against the steamer Florida] for damages for collision. The libel was for a collision by the Florida with the schooner Marion A., and by which the schooner was sunk and her cargo damaged, on the morning of February 17th, 1877, at about six o'clock, on a dark morning, at a point about seventy-five yards south by east of the Red Buoy, which is placed nearly opposite the custom-house on the Portsmouth side in Norfolk harbor. The loss was about $1,000.

HUGHES, District Judge. The cause is one of a steamer coming into a harbor studded with vessels at anchor and lined with vessels moored at the wharves, in what its witnesses called a dark night, and colliding with a vessel at anchor. A collision by a steamer running into a vessel lying at anchor anywhere, raises the presumption of fault against the steamer. Much stronger is this presumption where the collision is in a harbor at night when and where the utmost caution is required of the moving vessel. And steamers in motion are held to stricter responsibility for fault than sailing vessels in motion; because of the greater facility with which their navigators can manage them. I need not cite authority for these obvious propositions. They are well-settled laws. On the other hand, I held in The J. D. Everman Case [Case No. 7,591], that in an open roadstead several miles square. where there was no harbor master and no known or conceded line of channel, a vessel might anchor anywhere at will. While that is emphatically the case in Hampton Roads, it is not the case in the harbor of Norfolk and Portsmouth,

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

deep water in which constitutes a channel in most of the harbor of only the width of a few hundred yards. Here they have a harbor-master, who ought to be held to a very strict attention to his work and to an unremitted discharge of his duty day and night. He ought to be an active, energetic, ever-watchful, never-negligent, earnestly-faithful man to his duties. Any other sort of harbor-master will be the cause of frequent collisions, much dissatisfaction to navigators frequenting the port, and continual and indefinite injury to the commerce of the two cities. I say that a harbor-master is here who ought to be on hand to assign vessels to proper and safe places of anchorage at all times. A vessel placed at anchor by him is presumptively free from fault as to the place of lying at anchor. Vessels, indeed, must often cast anchor at times when they cannot avail of the services of the harbor-master. A vessel which casts anchor at such a time selects its place of anchorage on its own responsibility. If a vessel anchors at an improper place anywhere it is at fault, though if a steamer run into her when thus at fault the presumption is against the steamer and the burden of proof is upon the steamer to show the fault of the vessel. If a vessel chooses a wrong anchorage in a much-frequented and narrow harbor it will be held to more strict responsibility, and to be more violently in fault, because of its being in a harbor; but if she is run into by a steamer while lying there the presumption will be violently against the steamer, and the burden of proving fault in the vessel will rest still upon the steamer.

It is for the interest of all that settled rules of law on these subjects should be enforced. It will not do to say that the public interest of a city requires that steamers should be favored by the courts at the expense of smaller craft. Nor will it do on the other hand to maintain that men of small means and having small properties, like sloops and schooners, ought to be favored by the courts at the expense of wealthy companies owning great steamers. Ideas of what class of vessels do most service to the public cannot enter into the deliberations of court in cases of collision. Neither class of vessels can be allowed to proceed upon the notion that the other class has no right which it is bound to respect.

If steamers run out of the channel or too close to the edge of the channel of a harbor, and in doing so strike a vessel at anchor, it will be always held in this court to be responsible for the consequences. It has no right to try experiments of nice running in a narrow and much-frequented harbor. It must seek the middle of the channel and not swerve from it if possible.

On the other hand, vessels cannot be countenanced by the court in anchoring within the channel. Their duty is to get on the edge of it or out of it. If they obstruct the channel they must nôt expect to recover damages if they are run down or run into by vessels in motion. The master of a vessel may think it will do no harm for his vessel alone to anchor in the channel, it being very easy for a steamer to go around one vessel. But the exercise of such a liberty by one vessel demoralizes the whole discipline of a harbor, and no one vessel has a right to take a position in which, if a hundred other vessels took like positions there would be an obstruction of navigation. Example is always contagious, especially vicious example.

I think I have said enough to indicate that I consider this case to turn entirely upon one single question; and that is, whether the Marion A. was anchored in the channel too far from the edge of it at the time of the collision. As to the light, the Florida's witnesses only say that they did not see a light on the schooner. But the testimony of the witnesses of the schooner is positive, consistent and outspoken on that point. Captain Dehart saw the light was put up, the seaman Post testifies that it was put up, and Mr. Robert Mercer saw it hanging and burning after the collision. Nor is it worth while to consider the point made by claimant's counsel as to the lookout of the Marion A. A vessel must have proper lookouts until she is anchored, and is always held strictly to the duty of keeping a lookout when not anchored; but when once anchored the lookout, who is an officer of navigation on a vessel in motion, becomes then a mere watchman for purposes of patrol, protection, and warning on the anchored vessel. So that the case turns solely upon the question, where was this schooner anchored?

The libel recites that, at the time of the collision, the Marion A. was lying "just south of the Red Buoy," which is fixed on the edge of the channel on the Portsmouth side. The answer admits and alleges that "the point at which said schooner was then anchored is about south by east of said buoy, and about midway between the cities of Norfolk and Portsmouth, to the southward of the United States custom-house at Norfolk." Without reciting and commenting upon the evidence of each witness who testified in the case on this point, I think I can safely say that their evidence on either side is substantially epitomized in the language I have quoted from the libel and answer. I shall take the position of the schooner at anchor to be that assigned to it by the answer, which was deliberately drawn and intelligently and deliberately sworn to by Captain Dawes. The only point left open to doubt by the allegation of the answer is as to the distance at which the schooner lay from the Red Buoy on the course of south by east. The schooner's testimony is that this distance was fifty yards, though Hubbard places it at one hundred and fifty yards. I shall assume that it was a hundred yards, and this distance would place it about due south of the custom-house. I have no better guide in ascertaining the po-

sition of the schooner from these data than the official chart of the harbor made by the officers of the United States coast survey, a copy of which I have before me.

The testimony of witnesses as to depth of water is always perplexingly inaccurate; and there is no safe guide but the charts. The official chart gives a channel north of the Red Buoy of more than three hundred yards in width, clear of wharves, slips, and docks. All these charts lay down three dotted lines: one representing the line of six feet depth of water on each side of the channel; another of twelve feet depth; and the third of eighteen feet depth. The channel of Norfolk harbor, north of the Red Buoy, between the two lines of eighteen feet depth, is about three hundred yards in width, and from twenty-five to forty-two feet in depth. The Red Buoy sits south of the channel on the Portsmouth side, and a little south of the line of twelve feet water on that side. I have drawn a red line from the Red Buoy on the chart on the course of south by east. This line intersects the line of twelve feet water at a distance of about 100 yards from the Red Buoy, and intersects the line of eighteen feet water at a distance of 300 yards from that buoy. If, therefore, the schooner was lying anywhere within a distance of 100 yards wide from the buoy on a south-by-east course, it was within the line of twelve feet water, and there was an open, free channel north of it nearly 400 yards and 12 to 42 feet deep. If the schooner was lying anywhere within 300 yards of the Red Buoy on this south-by-east course, it was within the line of eighteen feet water, and there was an open, free channel north of her of 300 yards in width and 18 to 42 feet in depth. The schooner was south of the line of twelve feet water, and outside of the principal main channel of navigation in the harbor. It would have been more prudent for it to have been farther south and on the flats, because steamers drawing less than twelve feet water could follow it and strike it where it was; but still it was not in the channel, and scarcely on the edge of the channel, properly so called, at the point at which it was actually lying. But this does not constitute a fault in the schooner. All that could possibly be claimed is, that it was an imprudence in view of the fact that steamers often run outside of the main channel in running short cuts to their points of destination. The schooner, therefore, was not legally in fault.

The next question is, whether the steamer had a right to run close to the south edge of the channel in a harbor where that edge is the usual anchoring ground of shipping, and on a dark morning, when the utmost caution was incumbent on the steamer, and when it was most especially her duty to avoid all risk and keep to the middle of the channel. The officers of the Florida account for her running in the direction of the schooner by referring to the position in which a Norwe-gian bark was then lying at anchor. I judge from what has been stated in evidence, though that was very uncertain and unreliable, that the Norwegian bark was lying southeast of the Red Buoy on the line of eighteen feet water. But even if she had been much farther north, and entirely out in the channel, there was room in a channel three hundred yards wide for the Florida to pass to the north of the bark. At all events the schooner cannot be held for the fault of the Norwegian bark. It was the duty of the harbor-master to require the bark to change her position; and both the harbor-master and the bark are blamable for the bark's position. But their fault did not relieve the steamer from the duty on such a night, and coming into a small harbor, to keep in the middle of the channel.

I feel called upon to make another remark. The Florida was moving into the harbor at a speed too great to check up and stop in the distance of about a hundred yards. It is very difficult for the officers of steamers to realize the fact that they have no legal right to run through a harbor at that speed. It is so seldom that harm occurs in doing so, and it is so customary with steamers to run at such speed, that habit passes with them for law, and they come to believe that such speed is legally allowable. The law of navigation for steamers moving in harbors is: that they must run at a speed under which they can check up within a much shorter space than a hundred yards. This is especially incumbent upon them when entering a harbor filled with vessels on a dark night. The Florida ought to have crept along feeling her way at the slowest speed. I make this as a general remark, and do not lay stress in this case, upon the speed at which the Florida was running. The steamer was in fault, but the fault consisted in leaving a channel three hundred yards wide and running along the edge of it, in or within the south line of twelve feet water. See The Granite State, 3 Wall. [70 U. S.] 310.

The decree must be against the steamer or its stipulators.